1

2

3

4

5

6

7

8

9              UNITED STATES DISTRICT COURT

10            WESTERN DISTRICT OF WASHINGTON
                        AT SEATTLE

11

12   DR. MAGDY FOUAD, individually and on behalf         Case No. C07-1764 MJP
     of all others similarly situated,
13                                                       CLASS ACTION
                          Plaintiff,
14                                                       ORDER ON MOTIONS TO
15       v.                                              DISMISS

16   ISILON SYSTEMS, INC., et al.,

17                        Defendants.

18

19         This matter comes before the Court on seven motions to dismiss Plaintiffs' consolidated

20   class action complaint (the "complaint") (Dkt. No. 54).  The motions to dismiss have been filed

21   by: (1) Defendants Barry Fidelman, Gregory McAdoo, Matthew McIlwain, James Richardson,

22   Isilon Systems, Inc., William Ruckelshaus, Sujal Patel, and Elliott Jurgensen (the "Isilon

23   Defendants") (Dkt. No. 78); (2) Defendant Steven Goldman (Dkt. No. 83); (3) Defendant Stuart

24   Fuhlendorf (Dkt. No. 86); (4) Defendants Morgan Stanley & Co. Inc., Merrill Lynch Pierce

25   Fenner & Smith Inc., Needham & Co. LLC, and RBC Capital Markets Corp. (the "Underwriter

26   Defendants") (Dkt. No. 77); (5) Defendants Sequoia Capital, Sequoia Capital X, Sequoia

27   Technology Partners X LP, Sequoia Capital X Principals Fund LLC, and SC X Management

ORDER ON MOTIONS TO DISMISS — 1

1   LLC (collectively "Sequoia") (Dkt. No. 75); (6) Defendants Atlas Venture, Atlas Venture Fund

2   V LP, Atlas Venture Entrepreneurs Fund V LP, and Atlas Venture Associates V LP (collectively

3   "Atlas") (Dkt. No. 81); and (7) Defendant Madrona Venture Group, LLC ("Madrona") (Dkt. No.

4   88).  After reviewing all motions, Plaintiffs' response (Dkt. No. 95), Defendants' replies, and all

5   papers submitted in support thereof, the Court rules as follows:  Defendants' requests for

6   dismissal of counts one, three, and six are DENIED; the Court GRANTS in part Defendants'

7   request for dismissal of the remaining counts:  the Section 12(a)(2) claims in count two against

8   Isilon, Fuhlendorf, and Goldman are DISMISSED; the claims in count four and count seven

9   against Sequoia, Atlas, and Madrona (the "Venture Capitalist Defendants") are DISMISSED;

10  and the Section 10(b) claims against Ruckelshaus and McIlwain are DISMISSED.  The Court's

11  reasoning is set forth below.

12  **Background**

13  This action is brought on behalf of a putative class of individuals who purchased

14  securities of Isilon, Inc. ("Isilon" or "the Company") from December 14, 2006 to November 8,

15  2007 (the "Class Period").  Isilon's initial public offering ("IPO") was conducted in the fourth

16  quarter of 2006 on December 14.  In conjunction with the IPO, Defendants released a Form S-

17  1/A registration statement and a Form 424B4 prospectus (collectively, the "Registration

18  Statement").  (¶ 1.)  Isilon completed a successful IPO of 89 million shares at $13 per share, for

19  which Isilon received about $105.7 million in proceeds.  (¶ 4.)

20  In the fall of 2007, Isilon issued three statements that immediately preceded a decreased

21  value in Isilon stock.  (¶¶ 9-13.)  On October 3, 2007, Isilon announced that it did not expect to

22  meet its projected revenue for the third quarter of 2007.  (¶ 9.)  On October 24, 2007, Isilon

23  announced the departure of its Chief Executive Officer ("CEO") and Chief Financial Officer

24  ("CFO") and postponed announcing financial results for the third quarter of 2007.  (¶ 11.)  On

25  November 8, 2007, the Company announced that its Audit Committee would conduct an internal

26  investigation regarding Isilon's practice of revenue recognition and that no financial results for

27

the third quarter of 2007 would be released until the investigation was complete.  (¶ 12.)  After each announcement, the price of Isilon shares fell.  (¶¶ 10, 11, 13.)

The Audit Committee concluded its investigation in the spring of 2008.  On April 2, 2008, the Audit Committee issued a financial restatement for the fourth quarter of 2006 and the first and second quarters of 2007 (the "Restatement").  (¶ 16.)  The Restatement indicates that $7 million of the $68 million in revenue reported during those three quarters had been incorrectly recognized.  (Id.)

Plaintiffs bring their claims on the theory that Defendants improperly recognized revenue both before the IPO and during the Class Period.  Plaintiffs allege that Defendants improperly recognized revenue on accounts: (1) that did not have legally binding terms; (2) where the fee was not fixed or determinable; (3) where collection was not probable; and (4) where the identity of the end-user was unknown.  (¶ 137.)  Plaintiffs further allege that Defendants falsely assured investors that Isilon "adhered to GAAP-compliant revenue recognition policies" and "recognized revenue only when certain conditions were met," thereby creating "the false impression that the Company was well-managed and its reported financials were true."  (¶ 139.)  Ultimately, Plaintiffs allege that Defendants' overstatement of financial revenues allowed the Defendants to complete a successful IPO and maintain an artificially inflated stock price throughout the Class Period.  (Id.)

Plaintiffs bring claims under Sections 11, 12(a)(2) and 15 of the 1933 Securities Act (the "Securities Act claims") and under Sections 10(b) and 20(a) of the 1934 Securities and Exchange Act (the "Exchange Act claims") and Rule 10b-5 promulgated thereunder.  Defendants have moved to dismiss all claims.

### Analysis

On a 12(b)(6) motion to dismiss, the Court must assess the legal feasibility of the complaint.  Accordingly, the Court accepts Plaintiffs' factual allegations as true and draws all

1   reasonable inferences in Plaintiffs' favor.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.

2   Ct. 2499, 2509 (2007).

3          The Court may not consider documents outside the pleadings on a 12(b)(6) motion unless

4   they are incorporated by reference into the complaint, form the basis of the plaintiff's claims, or

5   are matters of judicial notice.  U.S. v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).  Defendants

6   have requested that the Court take judicial notice of various documents, including Isilon's SEC

7   filings.  (Dkt. Nos. 76, 79, 82, and 109.)  Plaintiffs do not object to these requests.  (Dkt. No. 95

8   at 20.)  The Court grants the requests and will draw no inferences in favor of Defendants from

9   judicially-noticeable facts.  See McGuire v. Dendreon Corp., No. 07-800MJP, 2008 WL

10  1791381, at *4 (W.D. Wash. April 18, 2008).

11  **I. The Securities Act Claims**

12         As an initial matter, the Court determines that it must apply the stricter pleading standard

13  of Fed. R. Civ. P. 9(b) when reviewing the adequacy of Plaintiffs' Securities Act claims.  Rule

14  9(b) imposes a heightened pleading standard on allegations of fraud, requiring that "the

15  circumstances constituting fraud or mistake shall be stated with particularity."

16         Plaintiffs' Securities Act claims are alleged under a negligence theory and do not contain

17  an element of fraud.  However, a plaintiff will be subject to the particularity requirements of

18  Rule 9(b) if his complaint sounds in fraud, or "allege[s] a unified course of fraudulent conduct

19  and rel[ies] entirely on that course of conduct as the basis of the claim[.]"  In re Daou Systems,

20  Inc., 411 F.3d 1006, 1027 (9th Cir. 2005) (internal citation omitted).  If a plaintiff makes a

21  "wholesale adoption" of his securities fraud allegations for purposes of the Securities Act claim,

22  then the entirety of that claim "must satisfy the heightened pleading standard set out in Rule

23  9(b)." Id. at 1028.

24         Rule 9(b) was enacted to protect the reputation of a defendant accused of engaging in

25  fraudulent conduct, to minimize strike suits and to provide detailed notice of a fraud claim.  See

26  In re Gilead Sciences Sec. Litig., 536 F.3d 1049, 1056 (9th Cir. 2008); In re Stac Electronics

27

1    Sec. Litig., 89 F.3d 1399, 1405 (9th Cir. 1996).  These goals would be thwarted if the Court were

2    to apply the more liberal pleading standard of Rule 8(a) to negligence allegations that are

3    premised on the same conduct underlying Plaintiffs' fraud allegations.  A party is entitled to

4    plead in the alternative and may "set out two or more statements of a claim …, either in a single

5    count … or in separate ones."  Fed. R. Civ. P. 8(d)(2).  Nonetheless, to achieve the goals of Rule

6    9(b), the Court cannot allow a plaintiff to allege fraud, and alternately, allow the plaintiff to

7    recover "on the simple untruth of the otherwise fraudulent statement" without requiring that both

8    allegations meet the heightened pleading standard.  Wagner v. First Horizon Pharmaceutical

9    Corp, 464 F.3d 1273, 1278 (11th Cir. 2006).

10            Plaintiffs purport to bring counts one and two under a negligence theory, alleging that

11   Defendants failed to make a reasonable investigation into whether the statements contained in

12   the Registration Statement were true.  Plaintiffs state explicitly that the counts "do[] not sound in

13   fraud and [are] not based on any knowing or reckless misconduct by Defendants.  Any

14   allegations of fraud or fraudulent conduct and/or motive are specifically excluded from th[ese]

15   Count[s]."  (¶¶ 90, 105.)  Nonetheless, the Section 11 and Section 12(a)(2) claims against six of

16   the Defendants necessarily allege fraudulent conduct and are subject to the heightened pleading

17   requirement of Rule 9(b).

18            To support their Exchange Act claims, Plaintiffs allege that Defendants Isilon, Jurgensen,

19   Ruckelshaus, McIlwain, Fuhlendorf and Goldman engaged in fraudulent conduct by knowingly

20   or with deliberate recklessness making misrepresentations about improperly recognized revenue.

21   (¶¶ 298-303.)  The alleged misrepresentations and omissions in the Registration Statement

22   concern improper revenue recognition and are part of the same scheme and conduct that support

23   Plaintiffs' allegations of fraud under the Exchange Act.  Because Plaintiffs allege "a unified

24   course of fraudulent conduct" against these Defendants and "rely entirely on that course of

25   conduct" as the basis for both the Securities Act and Exchange Act claims, this Court must apply

26   the Rule 9(b) heightened pleading standard to the Securities Act claims.  In re Daou Sys., 411

27

ORDER ON MOTIONS TO DISMISS — 5

F.3d at 1027 (internal citation omitted); see also Pestube Sys. v. HomeTeam Pest Def., LLC, No. CIV-05-2832-PHX-MHM, 2006 U.S. Dist. LEXIS 34337, at *14-15 (D.Ariz. May 24, 2006) (applying Rule 9(b) to Lanham Act claim that was "grounded" or "sounding" in fraud because the complaint alleged "knowing" misrepresentations).

Rule 9(b) requires that Plaintiffs plead their claim with "particularized allegations of the circumstances constituting fraud," which may include "[t]he time, place, and content of an alleged misrepresentation" in addition to "the circumstances indicating falseness." In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1547-1548 (9th Cir. 1994). Ultimately, "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false." Id. at 1548.

**1. Count I: Section 11 of the Securities Act**

In conjunction with the IPO, Defendants Goldman, Patel, Fuhlendorf, Fidelman, Jurgensen, Ruckelshaus, McAdoo, McIlwain and Richardson (the "Individual Defendants") signed the Registration Statement. Defendants Morgan Stanley and Merrill Lynch acted as joint book-running managers for the IPO with Needham and RBC serving as co-mananagers (the "Underwriter Defendants"). (¶ 78.) Plaintiffs bring count one against these Defendants on the ground that the Registration Statement contained material misstatements and omissions of fact.

Section 11 creates a private remedy for any purchaser of a security if "any part of the registration statement …contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading[.]" 15 U.S.C. §77k(a). The claim "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." Herman & Maclean v. Huddleston, 459 U.S. 375, 381-82 (1983).

To succeed on their Section 11 claims, Plaintiffs must demonstrate that: (1) the registration statement contained an omission or misrepresentation; and (2) the omission or misrepresentation would have misled a reasonable investor about the nature of his investment.

ORDER ON MOTIONS TO DISMISS — 6

1    In re Daou Sys., 411 F.3d 1006, 1028 (9th Cir. 2005).  To meet the heightened pleading

2    requirement, Plaintiffs must "set forth an explanation as to why the statement or omission

3    complained of was false or misleading."  In re GlenFed, Inc., 42 F.3d at 1548.

4                            **i. Revenue Statement**

5        Plaintiffs allege that the Registration Statement misstated Isilon's total revenue for the

6    nine-month period ending on October 1, 2006 as $41,623,000.  Plaintiffs contend that this figure

7    is false because it includes revenue that was improperly recognized.  (¶ 80.)  For support,

8    Plaintiffs rely primarily on information provided by a confidential witness, CW1, regarding pre-

9    IPO revenue recognition on three of Isilon's accounts.  (See ¶¶ 68-77.)

10       As a preliminary matter, the Court finds that Plaintiffs' description of CW1's background

11   and job responsibilities at Isilon "support the probability that a person in the position occupied

12   by the source would possess the information alleged."  In re Daou Sys., 411 F.3d at 1015

13   (internal citation omitted).  Plaintiffs describe CW1 as an Isilon employee who worked as a

14   "revenue account manager " from September 2006 until shortly before the IPO.  (¶58.)  A

15   Certified Public Accountant, CW1 "was responsible for accounts receivable credit" and for

16   "monthly closings of revenue[.]"  (Id.)  CW1 also "provided management with revenue and

17   margin analyses."  (Id.)  CW1's firsthand knowledge of the allegedly improperly recognized

18   revenue came from CW1's assigned duty to collect payment on three of Isilon's largest accounts.

19   (¶¶ 58, 68.)  CW1 also "prepared drafts of the IPO Prospectus."  (¶ 58.)

20       CW1 supports Plaintiffs' Section 11 claims with allegations that Isilon improperly

21   recognized revenue before the IPO on three accounts.  CW1 alleges that $3 million in revenue on

22   the FM Radio account was improperly recognized in the third quarter of 2006 even though the

23   contract's terms were indeterminable and "allow[ed] FM Radio to return or exchange the Isilon

24   product at any time."  (¶ 70.)  CW1 also alleges that Isilon improperly recognized approximately

25   $200,000 in revenue prior to the IPO on a contract with Cedars-Sinai when Cedars-Sinai was

26   allowed to "return or exchange its Isilon hardware at any time for any product" and the contract

27

ORDER ON MOTIONS TO DISMISS — 7

1  did not contain fixed payment terms.  (¶¶ 71-72.)  Finally, CW1 alleges that Isilon improperly

2  recognized revenue in an amount greater than $200,000 on a contract with Comcast whose

3  payment terms were not fixed and had been "extended and extended."  (¶ 73.)

4       Defendants primarily attack these allegations by arguing that the described transactions

5  comply with appropriate revenue recognition policies, thereby discounting the theory that any

6  portion of the $41,623,000 in claimed revenue was improperly recognized.  These arguments are

7  more appropriate for a summary judgment motion.  Nonetheless, Plaintiffs do not rely on CW1's

8  allegations alone – they offer additional support for their Section 11 claim in the form of Isilon's

9  own "critical accounting policies," also included in the Registration Statement.  (See ¶ 81.)

10  These policies state:

11
12         We recognize product revenue when we have entered into a legally binding arrangement
          with a customer, delivery has occurred, the fee is deemed fixed or determinable and free of
          contingencies and significant uncertainties, and collection is probable.

13  CW1's descriptions of the FM Radio, Cedars-Sinai and Comcast contracts do not comport with

14  Defendants' own policy of appropriate revenue recognition.  According to CW1's allegations,

15  the FM Radio and Cedars-Sinai contracts were subject to "significant uncertainties" because

16  they contained terms that allowed return or exchange at any time, and both the Cedars-Sinai and

17  Comcast contracts were subject to unfixed payment terms that made collection difficult and

18  possibly improbable.

19       Defendants would have the Court disregard CW1's allegations because the Restatement's

20  adjusted  revenue figures were based on transactions that occurred after the IPO and not on any

21  transaction occurring prior to the IPO.  (See ¶ 172.)  The Restatement does not indicate whether

22  the Audit Committee investigated any transactions occurring before the IPO.  (See Dkt. No. 84-

23  9.)  The Restatement says that "[t]he investigation focused on revenue recorded in fiscal 2006

24  and the first three quarters of fiscal 2007," but explains that only "certain sales" and "specific

25  transactions" were reviewed.  (Dkt. No. 84-9 at 3.)  Despite Defendants' assurances that the

26  independent investigation was thorough, the Court cannot conclude that the Company's failure

27

ORDER ON MOTIONS TO DISMISS — 8

1   to issue a restatement for any pre-IPO transactions means that revenue recognition on all pre-IPO

2   transactions must have been legitimate, especially in light of CW1's sufficiently plead

3   allegations.

4       Finally, Defendants do not contest that the alleged revenue misstatement is a "material"

5   misrepresentation.  Because Plaintiffs successfully state a Section 11 claim on the allegation that

6   the Registration Statement misstated Isilon's total revenue for the nine-month period ending on

7   October 1, 2006, the Court need not address the remaining allegations of misrepresentation and

8   omission.  (See ¶¶ 82-87.)

9               **ii. Loss Causation**

10      Loss causation is the "causal connection between the [defendant's] material

11  misrepresentation and the [plaintiff's] loss." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S.

12  336, 342 (2005) (citation omitted).  Under Section 11 of the Securities Act, loss causation is an

13  affirmative defense on which Defendants bear the burden of proof.[1]  In re Worlds of Wonder

14  Sec. Litig., 35 F.3d 1407, 1422 (9th Cir. 1994).  Nonetheless, Defendants contend that Plaintiffs'

15  Section 11 claims must be dismissed on this motion.  (Dkt. No. 105 at 15, citing Jablon v. Dean

16  Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980) (affirmative defenses are appropriate grounds

17  for dismissal where they can be resolved on the face of the complaint).)

18      Rule 12(b)(6) dismissal is inappropriate "so long as the complaint alleges facts that, if

19  taken as true, plausibly establish loss causation."  In re Gilead Sciences Sec. Litig., 536 F.3d

20  1049 at 1057 (9th Cir. 2008).  Plaintiffs allege that the drop in Isilon's stock price was causally

21  related to the Registration Statement's misstated revenue figure.  Isilon's stock price fell after

22  each of three announcements made by the Company in the fall of 2007:  (1) an October 3, 2007

23  announcement that Isilon did not expect to meet its projected revenue for the third quarter of

---

[1]Loss causation is a required element for a Section 10(b) claim under the Exchange Act.  15 U.S.C. § 78u-4(b)(4).    Defendants do not challenge Plaintiffs' 10(b) claims on loss causation grounds.

ORDER ON MOTIONS TO DISMISS — 9

1   2007 (¶ 9); (2) an October 24, 2007 announcement postponing the release of third quarter

2   financial results and publicizing the departure of Isilon's CEO and CFO (¶ 11); and (3) a

3   November 8, 2007 announcement that the Company's Audit Committee would conduct an

4   internal investigation regarding  Isilon's practice of revenue recognition and that no financial

5   results for the third quarter of 2007 would be released until the investigation was complete (¶

6   12).  Allegations of improper revenue recognition relate directly to a company's later inability to

7   meet its target earnings.  See Greebel v. FTP Software, Inc., 194 F.3d 185, 202 (1st Cir. 1999)

8   (finding that improper revenue recognition "shift[s] earnings into earlier quarters, quite likely to

9   the detriment of earnings in later quarters").

10          Critically, the three disclosures do not identify improper revenue recognition practices as

11  occurring in a particular time period, either before or after the IPO.  Instead, the fall 2007

12  announcements informed the market that Isilon had likely engaged in improper revenue

13  recognition at some time previous.  Plaintiffs have plausibly alleged that the fall 2007

14  disclosures are causally connected to pre-IPO revenue that was improperly recognized and

15  reflected in the Registration Statement's revenue figure.  See In re Daou Sys., 411 F.3d 1006,

16  1026 (9th Cir. 2005) (finding loss causation allegations sufficient when they "provide[d]

17  [defendant] with some indication that the drop in [defendant's] stock price was causally related

18  to [defendant's] financial misstatements reflecting its practice of prematurely recognizing

19  revenue before it was earned").  At this stage, the Company's April 2008 Restatement does not

20  affect the plausibility of Plaintiffs' loss causation theory.

21          **2. Count II: Section 12(a)(2) of the Securities Act**

22          Section 12(a)(2) of the Securities Act allows a person who purchased a security on the

23  basis of a prospectus that included a materially false statement to seek rescission of the

24  transaction.  15 U.S.C. § 77l(a)(2).  Plaintiffs bring Section 12(a)(2) claims against Isilon,

25  Goldman, Fuhlendorf and the Underwriter Defendants.  As discussed above, Plaintiffs have

26

27

ORDER ON MOTIONS TO DISMISS — 10

1    sufficiently plead with particularity[2] that the Prospectus contained a material false statement or

2    omission – that the total revenue for the nine-month period ending on October 1, 2006 was

3    $41,623,000.  In addition, Plaintiffs must also plead that Defendants were sellers of the

4    securities, and that Plaintiffs purchased the securities from Defendants.  In re Daou Sys. Inc. Sec.

5    Litig., 411 F.3d 1006, 1028-29 (9th Cir. 2005).

6                    **i. Seller Status**

7           A "seller" is someone:  (1) who passes title to the securities; or (2) who solicits the sale

8    of securities to serve his own financial interest or the financial interest of the securities' owner.

9    Pinter v. Dahl, 486 U.S. 622, 647-50 (1988).  Plaintiffs' 12(a)(2) claims against the Underwriter

10   Defendants survive because those Defendants actually passed title of the securities pursuant to a

11   firm commitment underwriting.  Because Plaintiffs have not sufficiently plead that Isilon,

12   Goldman or Fuhlendorf were "sellers" of the securities, the 12(a)(2) claims against those

13   Defendants must be dismissed.

14          The complaint alleges that Isilon, Goldman and Fuhlendorf are "sellers" because they

15   issued and participated in the preparation of the Prospectus and paid for and participated in "road

16   shows" to promote the sale of Isilon stock. (¶¶ 28, 106, 108.)  The weight of authority indicates

17   that such participation does not constitute active solicitation under Pinter.

18          The Pinter Court expressly rejected the contention that Section 12 imposes liability for

19   "mere participation" in unlawful sales transactions, even if that participation constitutes "a

20   substantial factor in causing the transaction to take place."  Pinter, 486 U.S. at 649.  Courts

21   assessing allegations of sales participation similar to those alleged by Plaintiffs have concluded

22   that such activity is not sufficient to confer liability under Section 12 (a)(2).  Rosenzweig v.

23   Azurix Corp., 332 F.3d 854, 870 (5th Cir. 2003) (dismissing 12(a)(2) claims when defendants

24   did not "directly communicate with the buyer" or otherwise "assume[] the 'unusual' role of

25

26          [2]Plaintiffs must plead their Section 12(a)(2) claims with particularity for the same reasons
27   that the Court applied Rule 9(b) to the Section 11 claims.

ORDER ON MOTIONS TO DISMISS — 11

1    becoming a 'vendor's agent'") (internal citation omitted); <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d

2    1194, 1215 (1st Cir. 1996) (finding the defendants' preparation of registration statement and

3    participation in "activities" related to the sale did not confer liability when public offering was

4    made pursuant to a firm commitment underwriting); <u>Central Laborers Pension Fund v. Merix</u>

5    <u>Corp.</u>, No. CV04-826-MO, 2005 WL 2244072, at *6-8 (D.Or. Sep. 15, 2005) (collecting cases)

6    (same).

7          "Virtually all issuers routinely promote a new issue, if only in the form of preparing a

8    prospectus and conducting a road show." <u>Lone Star Ladies Inv. Club v. Schlotzsky's Inc.</u>, 238

9    F.3d 363, 370 (5th Cir. 2001). Plaintiffs' allegations against Isilon, Goldman and Fuhlendorf

10   consist of common issuer activity, and are not sufficient to establish seller liability under

11   12(a)(2).

12                    **ii. <u>Standing to Bring 12(a)(2) Claim</u>**

13         Although Lead Plaintiff Magdy Fouad purchased shares in the secondary market,

14   Plaintiff Southwest Carpenters purchased shares directly from the Underwriter Defendants in the

15   IPO. (¶ 26.) This sufficiently establishes standing for the plaintiff class and Defendants' motion

16   to dismiss on this ground is denied.

17   **II. <u>Count V: Section 10(b) of the Exchange Act</u>**

18         To state a claim for securities fraud under Rule 10b-5, Plaintiffs must establish five

19   elements: "(1) a misstatement or omission of fact, (2) scienter, (3) a connection with the

20   purchase or sale of a security,  (4) transaction and loss causation, and (5) economic loss." <u>In re</u>

21   <u>Daou Sys., Inc.</u>, 411 F.3d 1006, 1014 (9th Cir.2005). Because the claim alleges fraud, Plaintiffs

22   must plead "the circumstances constituting the fraud ... with particularity." Fed. R. Civ. P. 9(b).

23   Similarly, under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Plaintiffs'

24   allegations of false or misleading statements must (1) "specify each statement alleged to have

25   been misleading [and] the reason or reasons why the statement is misleading;" and (2) "state

26

27

ORDER ON MOTIONS TO DISMISS — 12

1    with particularity facts giving rise to a strong inference" that the defendant acted with the

2    required scienter.  15 U.S.C. § 78u-4(b)(1)-(2).

3          Plaintiffs bring count five against Isilon; Goldman and Fuhlendorf (former officers of the

4    Company); and Jurgensen, Ruckelshaus, and McIlwain (outside directors of Isilon who served

5    on the Audit Committee).  Defendants move to dismiss the claims on the ground that Plaintiffs

6    failed to allege particularized facts giving rise to a strong inference of scienter.

7          **1. A Strong Inference of Scienter**

8          To satisfy the scienter requirement, the complaint must "state with particularity facts

9    giving rise to a strong inference that defendant acted with the required state of mind."  15 U.S.C.

10   § 78u-4(b)(2).  In the Ninth Circuit, the required state of mind can be met through either "actual

11   knowledge" that a statement is false or misleading or "deliberate recklessness" as to the truth or

12   falsity of a statement.  In re Silicon Graphics, Inc. Sec. Litg., 183 F.3d 970, 977, 995 (9th Cir.

13   1999).  Plaintiffs must plead specific allegations as to each defendant's state of mind.  See

14   Rudolph v. UT Starcom, 560 F. Supp. 2d 880, 891 (N.D. Cal. 2008) ("plaintiff must plead facts

15   showing that each individual defendant acted with scienter").

16         The Supreme Court has formulated the following inquiry for determining scienter:

17   "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person

18   deem the inference of scienter at least as strong as any opposing inference?"  Tellabs, Inc. v.

19   Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2511 (2007).  The Ninth Circuit recently stated

20   that "[t]he Supreme Court's reasoning in Tellabs permits a series of less precise allegations to be

21   read together to meet the PSLRA requirement[.] …. Vague or ambiguous allegations are now

22   properly considered as a part of a holistic review when considering whether the complaint raises

23   a strong inference of scienter."  South Ferry LP, #2 v. Killinger, 542 F.3d 776, 784 (9th Cir.

24   2008).

25         As a preliminary matter, the Court finds that Plaintiffs' description of confidential

26   witnesses CW1, CW7, and CW9 are sufficient to support their allegations.  When using

27

ORDER ON MOTIONS TO DISMISS — 13

confidential witnesses, Plaintiffs must describe their sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" and provide "adequate corroborating details." In re Daou Sys., 411 F.3d 1006, 1015-16 (9th Cir. 2005) (finding that description of confidential witnesses including "his or her job description and responsibilities" sufficiently meets the PSLRA's requirements for confidential witnesses).

Plaintiffs describe CW1 as a Certified Public Accountant and former Isilon employee who worked as a "revenue account manager " from September 2006 until shortly before the IPO. (¶58.)  CW1's firsthand knowledge of the allegedly improperly recognized revenue came from CW1's assigned duty to collect payment on three of Isilon's largest accounts. (¶¶ 58, 68.)  The complaint describes CW7 as a former Isilon employee who "worked in different financial positions at Isilon from September 2005 until December 2007" and then was a "financial operations specialist" who reported to Isilon's treasurer until the end of 2006.  (¶ 64.)  CW7 then "remained in charge of credit and collections until December 2007[.]"  (Id.)  Finally, Plaintiffs describe CW9 as "the executive administrative assistant to CEO Goldman and CFO Fuhlendorf from April 2007 until Goldman and Fuhlendorf left the Company."  (¶ 66.)

### i. The Audit Committee Directors

Plaintiffs allege that CW1 informed Jurgensen of three instances of allegedly improper revenue recognition that occurred before the IPO.  (¶¶ 77, 260.)  Although Plaintiffs do not allege that Jurgensen played any direct role in improper transactions, CW1's report to Jurgensen of allegedly improper revenue recognition is sufficient to establish that Jurgensen knew or should have known of the alleged falsity of statements concerning Isilon's revenue and revenue recognition policies.  The complaint not only states that CW1 spoke with Jurgensen about the allegedly improper transactions, but that Jurgensen then requested additional information, which CW1 provided  in an email to Jurgensen detailing the transactions.  (¶¶ 77, 149.)  This allegation sufficiently establishes a strong inference of scienter and the claim against Jurgensen survives.

ORDER ON MOTIONS TO DISMISS — 14

1    However, Plaintiffs fail to plead a single allegation concerning Defendants Ruckelshaus

2    or McIlwain's knowledge of the alleged falsity of any statement concerning Isilon's revenue and

3    revenue recognition practices, and instead assert that they must have had knowledge of these

4    practices because they were members of the Audit Committee.  Without specific allegations, this

5    Court cannot simply assume that Jurgensen shared the information from CW1 with all members

6    of the Audit Committee or that the Audit Committee was aware of other information concerning

7    improper transactions.  The claims against Ruckelshaus and McIlwain must be dismissed.  See In

8    re GlenFed, 60 F.3d at 593 (dismissing claims against outsider defendants when scienter

9    allegations described only committee and generic responsibilities).

10                       **ii. Goldman and Fuhlendorf**

11   Plaintiffs have sufficiently alleged scienter as to Goldman and Fuhlendorf.  As discussed

12   above, the Court must evaluate whether all allegations combined create a strong inference of

13   scienter.  South Ferry, 542 F.3d at 784.  Plaintiffs offer four categories of allegations that, when

14   taken together, establish the necessary scienter for both Goldman and Fuhlendorf.

15   First, Plaintiffs' confidential witnesses provide specific examples of Goldman and

16   Fuhlendorf's direct participation in allegedly improper transactions.  In each transaction,

17   Plaintiffs allege that Isilon recognized revenue on indeterminate contracts.  CW1 alleges with

18   particularity that Goldman himself allowed flexible and indeterminate payment options on the

19   Cedars-Sinai account even though the revenue on those terms was recognized before the third

20   quarter of 2006.  (¶¶ 71-72, 143.)  CW7 details two transactions involving  Fuhlendorf where

21   revenue was recognized even though no concrete contract existed:  (1) the Intelligentias account,

22   where $1 million in revenue was improperly recognized because the transaction involved a

23   reciprocal sales transaction (¶¶ 153, 216-21); and (2) the Talon Data Systems account, where

24   revenue was recognized on $500,000 in the first quarter of 2007 even though the contract's

25   payment terms were flexible and payment had not yet been received by fourth quarter of 2007

26   (¶¶ 156-57).

27

ORDER ON MOTIONS TO DISMISS — 15

1    Second, the alleged examples of Goldman and Fuhlendorf's participation in transactions

2    involving improper revenue recognition are similar to the improper transactions described in the

3    Audit Committee's Restatement.  Further, the Restatement states explicitly that Goldman and

4    Fuhlendorf "participated directly in certain of the transactions for which [revenue] adjustments

5    are being recorded[.]"  (¶ 172.)  Defendants emphasize that the Audit Committee also

6    "concluded that the evidence about [Goldman and Fuhlendorf's] roles, knowledge and intent is

7    conflicting, disputed, and ultimately inconclusive."  (Id.)  Critically, the Restatement does not

8    absolve either Goldman or Fuhlendorf of wrongdoing.  At best, the Audit Committee's

9    unwillingness to make a conclusive determination on Goldman and Fuhlendorf's "knowledge

10   and intent" concerning the improper revenue recognition is a neutral statement that neither adds

11   to or subtracts from the inference of scienter.

12   Third, alleged violations of generally accepted accounting principles ("GAAP") and a

13   company's internal accounting policies can bolster the inference of scienter.  In re McKesson

14   HBOC, Inc. Sec. Litig., 126 F.Supp.2d 1248, 1273 (N.D.Cal. 2000) ("[W]hen significant GAAP

15   violations are described with particularity in the complaint, they may provide powerful indirect

16   evidence of scienter. After all, books do not cook themselves.").  Throughout the class period,

17   the company published its accounting and revenue reporting policies in multiple SEC filings.  (¶

18   208.)  These policies comply with GAAP and specific SEC criteria.  (¶¶ 210-214.)  The Court

19   can conclude that Fuhlendorf and Goldman, CFO and CEO of the Company, were aware of these

20   policies and were aware that the allegedly improper transactions described by CW1 and CW7

21   did not comply with them.  Further, the Court is unconvinced by Defendants' argument that

22   Goldman and Fuhlendorf might not have known how and when the revenue on these transactions

23   was being recognized.

24   Finally, the timing of Goldman and Fuhlendorf's departure from Isilon supports an

25   inference of scienter.  Goldman and Fuhlendorf left their positions at Isilon on October 24, 2007,

26   three weeks after the Company announced its "disappointing" preliminary revenue results for the

27

ORDER ON MOTIONS TO DISMISS — 16

1    Third Quarter of 2007 and two weeks before the Audit Committee announced that it would be

2    conducting an internal investigation.  (¶¶ 168-169.)  CW9 alleges that Goldman and Fuhlendorf

3    were fired by the Board of Directors.  (¶ 167.)  Standing alone, Goldman and Fuhlendorf's

4    departure would not support scienter.  But because the changes in management occurred while

5    Isilon was preparing its own internal investigation of revenue recognition practices, the

6    departures "add one more piece to the scienter puzzle."  In re Adaptive Broadband Securities

7    Litigation, No. C 01-1092 SC, 2002 WL 989478, at *14 (N.D.Cal. April 2, 2002) (finding a

8    strong inference of scienter where the timing of the management's departure was "highly

9    suspicious" and the plaintiffs alleged additional scienter facts in the complaint).

10    Defendants emphasize that neither Fuhlendorf or Goldman sold any stock during the

11    Class Period but instead continued to purchase Isilon stock.  This fact is not sufficient to

12    overcome the strong inference of scienter created by the allegations above.  The Court finds that

13    Plaintiffs' have sufficiently plead scienter as to Goldman and Fuhlendorf, and the 10(b) claims

14    against them and against Isilon survive this motion.

15    **III. Counts III, IV, VI and VII: Control Person Liability**

16    Under Section 15 of the Securities Act, "[e]very person who ... controls any person liable

17    under [Section 11 or Section 12 of the Securities Act] shall also be liable jointly and severally

18    with and to the same extent as such controlled person[.]" 15 U.S.C. §77o.  Section 20 of the

19    Exchange Act allows for similar control person liability: "[e]very person who ... controls any

20    person liable under [the Exchange Act] shall also be liable jointly and severally with and to the

21    same extent as such controlled person is liable[.]" 15 U.S.C. § 78t(a).  The control person

22    analysis is the same for both provisions.  To state a claim for control person liability, Plaintiffs

23    must allege: (1) a primary violation of the securities laws; and (2) that the defendant exercised

24    "control" over the primary violator.  Howard v. Everex Sys., 228 F.3d 1057, 1065 (9th Cir.

25    2000).

26

27

ORDER ON MOTIONS TO DISMISS — 17

1    The SEC has defined "control" as follows:  "The possession, direct or indirect, of the

2    power to direct or cause the direction of the management and policies of a person, whether

3    through ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.

4    Defendants Isilon, Goldman and Fuhlendorf do not contest their status as control persons.

5    Defendants Fidelman, Jurgensen, Ruckelshaus, McAdoo, and McIlwain move to dismiss the

6    control person claims against them, as do Defendants Sequoia, Atlas, Madrona.

7    As an initial matter, the Rule 8 notice pleading standard applies to the Court's evaluation

8    of these claims.  Plaintiffs are required to plead their primary violations with particularity, but

9    claims based on control person liability do not directly touch on circumstances that constitute

10   fraud.  Rule 9(b) requires only that the circumstances of fraud – the falsity of an alleged

11   misrepresentation – be plead with particularity.  "Control" over another actor does not constitute

12   a circumstance of fraud.  See Siemers v. Wells Fargo & Co., No. 05-04518, 2006 WL 2355411,

13   *14 (N.D. Cal. Aug. 14, 2006) ("[Control] is not a circumstance that constitutes fraud.  Plaintiff

14   is only required to assert fraud with particularity as to the primary violations.  At the control-

15   person level, liability exists irrespective of the control person's scienter.") (internal citation

16   omitted).

17   Defendants' argument to the contrary is in error.  In GlenFed, the Ninth Circuit affirmed

18   the district court's dismissal of primary liability claims under the Securities Act and Exchange

19   Act and the related control person liability claims "because the complaint does not satisfy Fed.

20   R. Civ. P. 9(b)."  GlenFed, 60 F.3d at 592.  The Ninth Circuit's language does not indicate that it

21   applied Rule 9(b) to the control person claims; when primary liability claims are dismissed for

22   failing to meet Rule 9(b), the control person claims that depend on those primary claims must be

23   dismissed.

24   **1. The Outside Directors**

25   Plaintiffs have plead sufficient facts alleging the status of Jurgensen, Ruckelshaus,

26   McIlwain, Fidelman, and McAdoo as control persons.  Whether a defendant is a control person

27

ORDER ON MOTIONS TO DISMISS — 18

1    is an intensely factual question, and a plaintiff will survive a motion to dismiss on allegations

2    that individual defendants, by virtue of their position, could and did control and influence the

3    company.  See In re Metawave Communs. Corp. Secs. Litig., 298 F. Supp. 2d 1056, 1091 (W.D.

4    Wash. 2003) ("At the motion to dismiss stage, general allegations concerning an individual's

5    title and responsibilities are sufficient to establish control.").  While an outside director "is not

6    automatically liable as a controlling person[,]" the director status "is sort of a red light"

7    indicating the potential for day-to-day involvement in a company.  Arthur Children's Trust v.

8    Keim, 994 F.2d 1390, 1397 (9th Cir. 1993).

9            In addition to their status as outside directors, Plaintiffs have alleged that Defendants

10   Jurgensen, Ruckelshaus, and McIlwain were members of Isilon's Audit Committee, responsible

11   for Isilon's internal controls, independent auditors, and for reviewing financial results, press

12   releases and Isilon's code of ethics.  (¶¶ 256-59, 310.)  This position relates directly to the

13   subject of Plaintiffs' fraud allegations, and the Court can infer that Jurgensen, Ruckelshaus, and

14   McIlwain had control over the very mechanisms intended to prevent the alleged fraud.  Further,

15   Plaintiffs allege that Defendants Fidelman, McAdoo, and Ruckelshaus served on Isilon's

16   Nominating and Governance Committee and were responsible for "overseeing the evaluation of

17   the board of directors and management."  (¶¶ 33, 311.)  At the least, the Court can infer that this

18   authority required direct engagement in and awareness of management of the company.  These

19   allegations are sufficient to establish claims for control person liability against Defendants

20   Fidelman, Ruckelshaus, Jurgensen, McAdoo, and McIlwain.  Because Isilon, Goldman, and

21   Fuhlendorf did not challenge the sufficiency of the claims against them, counts three and six

22   should survive these motions to dismiss in their entirety.

23        **2.  The Venture Capital Firms**

24            In counts four and seven, Plaintiffs allege that Defendants Sequoia, Atlas and Madrona[3]

25

26            [3]It is unclear whether Plaintiffs' have named the correct Madrona entity as a Defendant in

27   this action.  The issue need not be resolved on this motion because the Court finds Plaintiffs' control

1   (the "Venture Capital Defendants") are liable as control persons for primary violations of the

2   Securities Act and the Exchange Act.[4]  Because Plaintiffs rely on conclusory allegations, counts

3   four and seven must be dismissed.  In re Gupta Corp. Sec. Litig., 900 F. Supp. 1217, 1243 (N.D.

4   Cal. 1994) (dismissing conclusory allegations where "plaintiffs allege[d] no facts to support their

5   allegations of control.").

6        The control person question is "intensely factual" and involves "scrutiny of the

7   defendant's participation in the day-to-day affairs of the corporation and the defendant's power

8   to control corporate actions."  No. 84 Employer-Teamster Joint Council Pension Trust Fund v.

9   America West Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003) (internal quotation marks and

10  citation omitted).  Plaintiffs allege only two facts to support their theory of control:  (1) each

11  Venture Capital Defendant was a large shareholder (¶129, 316); and (2) each Venture Capital

12  Defendant appointed a member/members of Isilon's Board of Directors (¶¶ 129, 316).[5]

13       Without alleging that the Venture Capital Defendants controlled Isilon by acting in

14  concert, Plaintiffs combine the three venture capital groups to allege that, collectively, these

15  Defendants "beneficially owned 69.8% and 60.2% of the shares of Isilon immediately before and

16  after the IPO, respectively."  (¶129, 316.)  Again grouping the Defendants together, Plaintiffs

17  allege that "[d]irectors and partners of the Venture Capital Firms comprised half of the Isilon

18  Board of Directors[.]"  (Id.)  Without additional allegations that the venture capital firms acted

19  together to control Isilon, these allegations of control by virtue of collective ownership are

20  conclusory and unconvincing.  See America West, 320 F.3d at 927 (finding plaintiffs had

21  _____

22  person claims against the Venture Capital Defendants unsustainable.

23       [4]Plaintiffs conceded during oral argument that they do not allege that the Venture Capital
    Defendants exercised control over their appointed board members.

24

25       [5]Plaintiffs attempt to bolster these allegations with information from the venture capital
    firms' websites in their opposition brief.  (Dkt. No. 95 at 66-68.)  These outside sources are not
26  incorporated into the complaint by reference, and the Court must look only to the sufficiency of
    allegations contained in the complaint when ruling on a motion to dismiss.
27

1    adequately plead control person liability against two large shareholders where the shareholders

2    had "allegedly joined forces to exert undue influence" on the company, "taking advantage of

3    their position as majority owners who controlled the Board of Directors and related

4    committees"); In re Worlds of Wonder Sec. Litig., 721 F. Supp. 1140, 1145 (N.D. Cal. 1989)

5    (finding that plaintiffs insufficiently plead securities fraud claims against a group of defendants

6    when plaintiffs grouped them together but "alleged nothing which would at all suggest that these

7    defendants acted 'collectively'[.]").  Plaintiffs make no allegations of collective action in their

8    complaint.

9           Individually, the three venture capital firms were minority shareholders with one

10   appointed member on Isilon's Board of Directors.  Courts in this Circuit have held that a

11   defendant's status as minority shareholder is insufficient to establish control person liability,

12   even when combined with the power to appoint directors.  See In re Gupta, 900 F. Supp. at 1243

13   (dismissing a Section 20(a) claim against a minority shareholder with an agent on the board);

14   O'Sullivan v. Trident Microsystems, Inc., No. 93-20621 RMW, 1994 WL 124453, at *18-19

15   (N.D.Cal. Jan. 31, 1994) (same); In re Splash Technology Holdings, Inc. Securities Litigation,

16   No. 99-00109-SBA, 2000 WL 1727405, at *16 (N.D.Cal. Sept. 29, 2000) (dismissing control

17   person claim against a defendant with "a significant stock position" but where the complaint

18   "fail[ed] to provide some corroborating, particular evidence of control").

19

20

21

22

23

24

25

26

27

1

**Conclusion** [6]

2      For the reasons stated above, the Court hereby DENIES Defendants' request for

3  dismissal of counts one, three and six, and GRANTS in part the remaining requests for dismissal

4  as follows:  the Section 12(a)(2) claims in count two against Isilon, Fuhlendorf, and Goldman are

5  DISMISSED; the claims in count four and count seven against Sequoia, Atlas, and Madrona are

6  DISMISSED; and the Section 10(b) claims against Ruckelshaus and McIlwain are DISMISSED.

7      The Clerk is directed to send a copy of this order to all counsel of record.

8      Dated:  December 29, 2008.

9

10

11                Marsha J. Pechman

12                U.S. District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

---

26      [6]The Court has attached a chart reflecting its decision for the convenience of the parties.  It

27  would be helpful in future filings if similar charts were produced by the parties.

ORDER ON MOTIONS TO DISMISS — 22

| | Count I: § 11 | Count II: §12(a)(2) | Count III: §15 | Count IV: §15 | Count V: §10(b), 10b-5 | Count VI: §20(a) | Count VII: §20(a) |
|---|---|---|---|---|---|---|---|
| **Isilon** | | dismissed | | | | | |
| Patel | | | | | | | |
| Fidelman | | | | | | | |
| Jurgensen | | | | | | | |
| Ruckelshaus | | | | | dismissed | | |
| McAdoo | | | | | | | |
| McIlwain | | | | | dismissed | | |
| Richardson | | | | | | | |
| **Fuhlendorf** | | dismissed | | | | | |
| **Goldman** | | dismissed | | | | | |
| **Sequoia** | | | | dismissed | | | dismissed |
| **Atlas** | | | | dismissed | | | dismissed |
| **Madrona** | | | | dismissed | | | dismissed |
| **Morg Stnly** | | | | | | | |
| **Merr Lynch** | | | | | | | |
| **Needham** | | | | | | | |
| RBC | | | | | | | |